22980.  NOTTINGHAM v. WRIGLEY et al.

ARGUED SEPTEMBER 15, 1965—DECIDED OCTOBER 7, 1965.

*Grant, Spears & Duckworth, William H. Duckworth, Jr.,* for plaintiff in error.

*Claude Hambrick,* contra.

GRICE, Justice. Whether there was evidence for submission to the jury as to liability of one of the defendants in a tort action is the issue now before us.

This issue comes from a suit, filed in the Civil Court of Fulton County by W. M. Nottingham against Norman J. Wrigley, Jr., Mrs. Madeline Wrigley and James S. Cox, for damages allegedly resulting from the defendants' maliciously procuring a breach of the plaintiff's employment contract and interfering with his property rights.  Upon the trial, after direction of a verdict in favor of Mrs. Madeline Wrigley, the jury found in favor of the plaintiff as against both Norman J. Wrigley, Jr. (hereinafter referred to as Wrigley) and Cox.  The trial court denied the motions for judgment notwithstanding the verdict made by both Wrigley and Cox.  Upon review the Court of Appeals affirmed the denial of Wrigley's motion, but reversed as to that of Cox. *Wrigley v. Nottingham,* 111 Ga. App. 404 (141 SE2d 859).  We granted Nottingham's application for certiorari. He assigns error upon the portion of the Court of Appeals' judgment which reversed the trial court's denial of Cox's motion for judgment notwithstanding such verdict.

The plaintiff Nottingham predicated his claim upon a contract, first oral and later allegedly reduced to writing, employing him as manager and bookkeeper of a corporation, Wrigley Sales, Inc., and promising to compensate him by a salary payable in both money and voting stock. While so employed, he was to make loans to the corporation at a specified rate, and to secure them by assignments to himself of accounts due the corporation. The three defendants comprised the board of directors of the corporation, and Wrigley owned all of its voting stock.

After the plaintiff had worked for about two months and had made a number of loans to the corporation he was discharged by action of the three defendants at a directors' meeting. The plaintiff contended that they conspired to maliciously procure the breach of his contract with the corporation and interfere with his property rights. He sued for lost earnings in cash and voting stock, amounts due him on loans, punitive damages, expenses of litigation, and attorney's fees.

Upon the trial the evidence was in sharp conflict. The defendants denied that the plaintiff's discharge was malicious, testifying that it was occasioned only by his mismanagement of the business, and stated that the subsequent shifting of the assets of the corporation was done to repay loans and to keep the business in operation. However, the jury found in favor of the plaintiff's contentions against both Wrigley and Cox.

Upon review the Court of Appeals referred to certain portions of the evidence which it deemed significant and held that it, together with the evidence as a whole, authorized the jury's finding that the plaintiff's discharge and the subsequent shifting of the corporate assets were done by Wrigley, with knowledge of the plaintiff's rights, and with intent to interfere with them, and thus were actionable. It cited *Employing Printers Club v. Doctor Blosser Co.*, 122 Ga. 509 (50 SE 353, 69 LRA 90, 106 ASR 137, 2 AC 694).

But it held (p. 408) that, "There is nothing in the evidence showing or tending to prove that . . . [Cox] did anything maliciously to procure the breach of the plaintiff's contract with the corporation or to interfere with the performance of the agreement," and that proof of a conspiracy was lacking.

In so holding the Court of Appeals erred, as we view the evidence and the legal principles which control it.

Our Code provides that "The right of enjoyment of private property being an absolute right of every citizen, every act of another which unlawfully interferes with such enjoyment is a tort for which an action shall lie." *Code* § 105-1401.

Also, *Code* § 105-1207 provides that "In all cases he who maliciously procures an injury to be done to another, whether it is an actionable wrong or a breach of contract, is a joint wrongdoer, and may be sued either alone or jointly with the actor."

Thus, those Code sections contemplate that acts such as those charged here may be committed individually, either by one person doing the prohibited acts or by his procuring another person to do them. Violation also may occur by means of a conspiracy.

As to conspiracy, there are several well established rules that are applicable here.

Insofar as proof of a conspiracy is concerned, " 'The law recognizes the intrinsic difficulty of proving a conspiracy . . . The conspiracy may sometimes be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances . . . "To show conspiracy it is not necessary to prove an express compact or agreement among the parties thereto. The essential element of the charge is the common design; but it need not appear that the parties met together either formally or informally and entered into any explicit or formal agreement; nor is it essential that it should appear that either by words or writing they formulated their unlawful objects. It is sufficient that two or more persons in any manner either positively or tacitly come to a mutual understanding that they will accomplish the unlawful design . . ." ' " *Cook v. Robinson*, 216 Ga. 328, 329-330 (116 SE2d 742). Also, "Where transactions between relatives are under review, slight circumstances are often sufficient to induce belief on the part of a jury that there was fraud or collusion" for a conspiracy, quoted approvingly in *Horton v. Johnson*, 192 Ga. 338, 346 (15 SE2d 605) (one special concurrence).

Then, as to the consequences of a conspiracy, the rule is well established that the act of one is the act of all. Conspirators "are jointly and severally liable for all the acts of each, done in pursuance of the conspiracy." *Smith v. Manning*, 155 Ga. 209 (2) (116 SE 813); *Wall v. Wall*, 176 Ga. 757, 760 (168 SE 893).

Viewed in the light of these rules of law, there was evidence as to the participation of the defendant Cox, individually or in concert with Wrigley, which required submission to the jury.

We point to several features of evidence in this regard.

At the outset, it is significant that the business here was a closely held family corporation. The dominant figure was the defendant Wrigley, owner of all the voting stock, president and a director. He took over the presidency from his mother, the defendant Mrs. Madeline Wrigley, who was also a director. The vice-president and a director was the defendant Cox, whose brother was married to Wrigley's sister. Also, there was Wrigley's wife, an employee, who was elected by the directors as secretary-treasurer when they discharged the plaintiff. These are circumstances which must be considered.

Also, there is the evidence relating to the employment contract. The plaintiff's testimony was that this was a definite agreement, first made orally with Wrigley as the corporation's president, and later recognized at a directors' meeting. However, from Wrigley's testimony it appeared that this particular directors' meeting did not in fact take place, but that there was a minute-book entry, signed by Cox and Wrigley's wife, as to the plaintiff's contract which merely recited his election as secretary-treasurer for the purpose of executing a specified contract for the corporation. The minute book was not produced upon the trial. One of the defendants testified that it had been turned over to the bankruptcy trustee, but that official denied ever having received it. Wrigley also testified that the agreement with the plaintiff was not to employ him but was for him to lend money to the corporation on certain terms. Yet from the testimony of both Wrigley and Cox it appears that the plaintiff was continually present at the place of business and performed executive duties on its behalf until he was discharged. Furthermore, it was the manner of his performance of these very duties that was recited as the reason for his discharge.

Next, the evidence as to the basis for the plaintiff's discharge has a distinct bearing here. The action taken by the defendants recited that basis to be mismanagement. But the testimony showed that the company's business during the plaintiff's connection with it was much better than before. Also, the evidence

was that between the date of his discharge and the company's bankruptcy a short time later, its assets of some $65,000 or $70,000 declined to about $5,000. Furthermore, there is no indication whatever that either Cox or Wrigley complained of any mismanagement by the plaintiff until the directors' meeting at which he was discharged. There was ample evidence that Cox was familiar with the plaintiff's management of the business. Cox, while not actually employed there, testified that he was interested in the business, went there in his spare time, and "put in many an hour out there working." Therefore, his vote for the plaintiff's discharge because of mismanagement, in the face of this evidence, raises a question for the jury as to his real motive in voting to discharge the plaintiff.

Then, the directors' meeting at which this action was taken sheds light upon Cox's role in the plaintiff's discharge. While waiting for the called meeting to begin Cox and Wrigley discussed the contemplated discharge, although Cox denied that he then committed himself as to his forthcoming vote. According to Mrs. Madeline Wrigley's testimony, there was no discussion whatever at the meeting. Wrigley "just told [her] he was going to dismiss Mr. Nottingham on account of mismanagement." As to his vote, Cox testified "If [Wrigley] said it was time to get rid of the man, I thought it was, too."

Another circumstance warranting an inference against Cox is the evidence as to shifting of the corporation's goods after the plaintiff's discharge. Eight days later considerable inventory was transferred by Wrigley to his mother, purportedly in payment of a loan. Also, a transfer of other corporate assets was made by Wrigley to himself, allegedly to satisfy a loan due him. Cox testified that he discussed this transfer with Wrigley; approved it and "went along with him" on it.

There is also Cox's admitted part in the attempt to conceal the company's money from the plaintiff. Shortly after his discharge, Wrigley opened additional bank accounts, some in other cities. One of these accounts was in the corporation's name where he would deposit checks made payable to the corporation. Another was in his daughter's name, to which he would transfer such money from the corporate account. In his testimony Cox stated that he knew about these accounts, and in

response to a direct question he acknowledged playing a part in such arrangements by signing checks drawn upon such corporate account.

This admitted involvement of Cox in the shifting of corporate assets, preventing the plaintiff from recouping his loss sustained by breach of his contract, was a telling circumstance inferring that Cox had acted in connection with Wrigley to maliciously injure the plaintiff.

Finally, there is the testimony of Cox, after seeing and hearing Wrigley testify as to these various transactions, that he knew about every one of them.

A thorough study and evaluation of this record, pursuant to applicable principles of law, clearly shows that there was evidence sufficient to require submission to the jury of the question whether or not Cox acted, individually or with Wrigley, maliciously to procure a breach of the plaintiff's contract and interfere with his property rights.

Since the evidence, with all reasonable deductions or inferences therefrom, did not demand a verdict in favor of the defendant Cox, his motion for judgment notwithstanding the verdict was properly denied. *Code Ann.* §§ 110-104, 110-113.

The judgment of the Court of Appeals holding to the contrary is

*Reversed. All the Justices concur, except Duckworth, C. J., who is disqualified, and Mobley, J., not participating for providential cause.*